## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | |
|---|---|
| MARVIUS RAY CRAWFORD, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> ALLENBROOKE NURSING AND ) <br> REHABILITATION CENTER, LLC, d/b/a ) <br> Allenbrooke Nursing and Rehabilitation ) <br> Center, et al., ) <br> ) <br> Defendants. ) | No. 2:21-cv-02054-TLP-tmp <br><br> JURY DEMAND |

**ORDER DENYING DEFENDANT ALLENBROOKE NURSING AND REHABILITATION CENTER, LLC'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS**

This case arises from the alleged mistreatment of Izalia Crawford while at Allenbrooke Nursing and Rehabilitation Center, LLC ("Allenbrooke") in Memphis, Tennessee. Plaintiff Marvius Ray Crawford sued as next of kin of Ms. Crawford and on behalf of her wrongful death beneficiaries. Defendant Allenbrooke[1] now moves to compel arbitration of Plaintiff's claims and for the Court to stay the case pending arbitration. (ECF No. 19.) Plaintiff responded in opposition and Defendant replied. (ECF Nos. 27 & 33.)

---

[1] Plaintiff also names Aurora Cares, LLC; DTD HC, LLC; D & N, LLC; Donald T. Denz; and Norbert A. Bennett (collectively, "Non-Facility Defendants") as Defendants in this suit. (*See* ECF No. 1.) Defendant Allenbrooke moved to compel arbitration (ECF No. 19), and the Non-Facility Defendants moved to dismiss Plaintiff's claims against them for lack of jurisdiction (ECF No. 17). Although the Non-Facility Defendants argue that this Court has no personal jurisdiction over them, they also argue, in the alternative, that if the Court denies their motion to dismiss, the claims against them are also subject to arbitration for the same reasons provided in Defendant Allenbrooke's motion to compel arbitration. (*Id.* at PageID 178.) Contemporaneous with the entry of this order, the Court denied the motion to dismiss.

For the reasons below, the Court **DENIES** Allenbrooke's motion to compel arbitration and stay proceedings.

## BACKGROUND

Here are the facts.[2]  Plaintiff took his mother, Izalia Crawford, to Allenbrooke's long-term care and rehabilitation center in October 2019.  (ECF No. 1 at PageID 9.)  Allenbrooke then admitted Ms. Crawford, who resided at the nursing home until May 2020, when Allenbrooke transferred her to Methodist Le Bonheur Germantown.  (*Id.*)  Next Methodist discharged her to Spring Gate Rehabilitation and Healthcare Center.  (*Id.*)  Ms. Crawford passed away there in April 2021.  (ECF No. 43 at PageID 906.)

Plaintiff alleges that, while under Allenbrooke's care, Ms. Crawford suffered mental anguish, pain, and suffering, and physical injuries, including a pressure sore that required the staff to perform many debridement procedures, poor hygiene, severe pain, and injuries to her dignity.  (ECF No. 1 at PageID 15.)  Plaintiff claims that Allenbrooke's negligence in caring for Ms. Crawford caused these injuries.  (*Id.*)

And so Plaintiff sues Defendants, alleging that they were negligent under the Tennessee Healthcare Liability Act ("THCLA") and, in the alternative, that the Non-Facility Defendants are liable for ordinary negligence.  (*Id.* at PageID 12–19.)  Plaintiff also amended his complaint after Ms. Crawford's passing and added a survival and wrongful death claim against Defendants. (ECF No. 43 at PageID 922–23.)

---

[2] Plaintiff amended his complaint recently.  (*See* ECF No. 43.)  Although his amended complaint added a wrongful death claim against Defendants, his other allegations remained the same.  As a result, Plaintiff's amendments do not impact the pending motion to compel arbitration, and the Court cites mostly to the original complaint in this Order.

Now Allenbrooke moves to compel arbitration and stay this action pending resolution of arbitration. (ECF No. 19.) At the center of Defendant's motion to compel are two documents: a power of attorney and an arbitration agreement.

In 2012, Ms. Crawford executed a power of attorney (the "POA") designating Plaintiff as her attorney-in-fact. (ECF No. 19-3 at PageID 238–39.) The POA gives Plaintiff "full and unlimited power . . . to perform all acts, execute all contracts and instruments of every kind and character, and transact any and all business and engage in any and all other transactions and matters of every kind and character in [Ms. Crawford's] name . . . ." (*Id.* at PageID 238.) It emphasizes that "[t]his instrument shall be construed for all purposes as vesting said Marvius Ray Crawford with an unlimited, open, general power of attorney of the broadest fashion possible to bind [Ms. Crawford] in all matters whatsoever[.]" (*Id.*) Finally, the POA states that it "shall be used and construed in accordance with the Laws of the State of Tennessee." (*Id.* at PageID 239.)

And before admitting his mother to Allenbrooke in 2019, Plaintiff executed a Resident and Facility Arbitration Agreement (the "Agreement") with Allenbrooke on Ms. Crawford's behalf. (ECF No. 19-2.) Under the Agreement:

> Any and all disputes between the Resident and the Facility shall be submitted to binding arbitration where the amount in controversy exceeds $25,000. This includes any disputes arising out of or in any way relating to this Agreement (its enforceability), the Admission Agreement, or any or the Resident's stays at the Facility, whether existing or arising in the future, whether for statutory, compensatory or punitive damages, and irrespective of the legal theories upon which the claim is asserted.

(*Id.* at PageID 235.) One section of the Agreement describes who can sign the contract. That section reads,

> **Those Signing this Contract.** A person signing who routinely makes decisions for the Resident, if not the Power of Attorney or Guardian/Conservator, will be

> considered a health care surrogate/proxy and/or Legal Representative. The parties agree that the signing of this Agreement, both by itself and in conjunction with the corresponding admission and receipt of services, is a health care decision. This executed Agreement becomes a part of the Resident's underlying Admission Agreement(s). The term "Resident" shall refer collectively to those signing with or for the Resident . . . .

(*Id.* at PageID 234.)

Allenbrooke now asks this Court to compel arbitration under the Agreement. It argues that "the plain language of the Power of Attorney shows that Mr. Crawford had the authority to sign the Arbitration Agreement" on Ms. Crawford's behalf. (ECF No. 19-1 at PageID 226.) In response, Plaintiff argues that Mr. Crawford did not, in fact, have authority to enter the Agreement, because the POA did not give him authority to make health care decisions for Ms. Crawford. (ECF No. 27 at PageID 257.)

The Court now turns to the legal standards for a motion to compel arbitration.

## **LEGAL STANDARDS**

**I.     Legal Standards for Determining the Existence of an Arbitration Agreement**

    **A.     The Federal Arbitration Act**

The Agreement says that the arbitrator will apply the law of the state where the facility is located, except that "the parties expressly stipulate that the Federal Arbitration Act, 9 U.S.C. §§ 1–16 shall exclusively govern the enforcement of this Agreement." (ECF No. 19-2 at PageID 234.) Although the Tennessee Uniform Arbitration Act ("TUAA") governs the conduct of any arbitration, the Federal Arbitration Act ("FAA"), which preempts any conflicting state laws, governs whether the Court has to enforce an arbitration agreement. *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 271–72 (1995).

So the FAA is the starting point for this analysis. Congress enacted the FAA "to overcome judicial resistance to arbitration." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S.

440, 443 (2006).  The FAA provides a way to petition a court to compel arbitration "upon being satisfied that the issue involved in such suit or proceeding is referable under such an agreement."  *See* 9 U.S.C. § 3.  Before compelling arbitration, courts first determine whether the parties agreed to arbitrate.  *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000).  Next, courts decide the scope of that agreement.  *Id.*  Finally, courts must decide whether to stay the remainder of the case if not all the claims are referred to arbitration.  *Id.*

> Section 2 of the FAA reflects the Act's breadth.  Under this section,
>
> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  The Supreme Court has interpreted this provision as "reflecting both a liberal federal policy favoring arbitration, and the fundamental principle that arbitration is a matter of contract."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal quotations and citations omitted).  So courts place arbitration agreements on "equal footing with other contracts."  *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010).  This "ensure[s] that private arbitration agreements are enforced according to their terms."  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 469 (1989).

But despite the FAA's broad reach, parties can challenge an arbitration agreement under the savings clause in § 2.  Under the savings clause, a party can invalidate an arbitration agreement "upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  A party therefore can challenge the validity, enforceability, or formation of an arbitration agreement.  When deciding whether the parties agreed to arbitrate, courts apply "ordinary state-law principles that govern the formation of contracts."  *First Options of Chic., Inc., v. Kaplan*, 514 U.S. 938, 944 (1995).

5

That said whether an arbitration agreement exists is a question for the court, not the arbitrator. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 530 (2019) ("[T]he court determines whether a valid arbitration agreement exists"); *Granite Rock Co. v. Int'l Broth. of Teamsters*, 561 U.S. 287, 297 (2010). "[N]o matter how strong the federal policy favors arbitration, 'arbitration is a matter of contract between the parties, and one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration.'" *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005) (quoting *United Steelworkers, Loc. No. 1617 v. Gen. Fireproofing Co*., 464 F.3d 726, 729 (6th Cir. 1972)). Courts therefore decide whether the parties agreed to arbitrate the relevant claims.

### B.  Burden of Proof on a Motion to Compel Arbitration

The Sixth Circuit treats motions to compel arbitration like motions for summary judgment. *See Boykin v. Fam. Dollar Stores of Mich., LLC*, 3 F.4th 832, 837 (6th Cir. 2021) ("The question whether the party opposing arbitration has put the making of the arbitration contract in issue looks a lot like the question whether a party has raised a genuine issue as to any material fact." (internal quotations omitted)); *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002). The court views all facts and inferences in the light most favorable to the nonmoving party. *Id.* The movant "bears the ultimate burden of establishing the existence of a valid agreement to arbitrate," and must present "some evidence" that the parties agreed to arbitrate. *Hammond v. Floor & Decor Outlets of Am., Inc.*, No. 3:19-cv-01099, 2020 WL 2473717, at *3 (M.D. Tenn. May 13, 2020); *Foust v. Comcast Corp*., No. 3:19-CV-173-HSM-DCP, 2020 WL 1891755, at *4 (E.D. Tenn. Jan. 28, 2020). Once the movant makes a prima facie showing of the agreement's existence, the party opposing arbitration "must show a genuine

6

issue of material fact as to the validity of the agreement to arbitrate." *Great Earth Cos., Inc.*, 288 F.3d at 889.

## II.     Choice of Law Analysis

Under the FAA, courts must enforce arbitration agreements unless state law contract principles instruct otherwise.  9 U.S.C. § 2.  When acting under diversity jurisdiction, federal courts apply the choice of law rules of the forum state.  *State Farm Mut. Auto. Ins. Co. v. Norcold, Inc.*, 849 F.3d 328, 331 (6th Cir. 2017).  Without a choice of law provision in the contract, Tennessee applies the rule of "lex loci contractus," which presumes that "a contract is []to be governed by the law of the jurisdiction in which it was executed absent a contrary intent." *Blackwell v. Sky High Sports Nashville Operations, LLC*, 523 S.W.3d 624, 632 (Tenn. Ct. App. 2017) (quoting *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 474–75 (Tenn. Ct. App. 2003)).  And when all parties "have acquiesced—without comment—to the use" of a certain state's law, a federal court does not have to "delve too deeply" into the choice of law analysis.  *GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1085 (6th Cir. 1998).

The parties here did not stipulate about what law applies, and the Agreement does not identify when the parties executed it.  But both parties agree that Plaintiff signed the Agreement when Allenbrooke admitted Ms. Crawford into its facility in Memphis, Tennessee.  (ECF Nos. 19-1 at PageID 223; 27 at PageID 256.)  So most likely the parties executed the documents in Tennessee.  Plus, Ms. Crawford was a Tennessee resident when Plaintiff executed the Agreement, and Allenbrooke's facility is in Tennessee.  (ECF No. 1 at PageID 1–2.)

As for the POA, it says that it is the power of attorney form for Shelby County, Tennessee, and that it "shall be used and construed in accordance with the Laws of the State of

Tennessee." (ECF No. 19-3 at PageID 238–39.) And both the Agreement and POA implicate events and services performed in Tennessee.

In addition, the parties "have acquiesced—without comment—to the use" of Tennessee law. *GBJ Corp.*, 139 F.3d at 1085. Indeed, both parties rely on federal law and Tennessee law in their briefings. (*See* ECF Nos. 19-1 at PageID 224; 27 at PageID 256.)

In short, because the parties both assumed Tennessee law applies to this dispute, the Court need not "delve too deeply" into the choice of law analysis. *GBJ Corp.*, 139 F.3d at 1085. For these reasons, the Court applies principles of Tennessee contract law.

### III. Legal Standards for Determining Plaintiff's Authority

#### A. Creating a Power of Attorney and Health Care Power of Attorney

Under Tennessee law, there is a difference between a durable power of attorney and a durable power of attorney for health care. A durable power of attorney "is a power of attorney by which a principal designates another as the principal's attorney in fact in writing and the writing contains . . . words showing the intent of the principal that the authority conferred shall be exercisable, notwithstanding the principal's subsequent disability or incapacity." Tenn. Code Ann. § 34-6-102. "All acts done by an attorney in fact pursuant to a durable power of attorney during any period of disability or incapacity of the principal have the same effect and inure to the benefit of and bind the principal . . . as if the principal were competent and not disabled." *Id.* § 34-6-103. And the Tennessee Uniform Durable Power of Attorney Act makes clear that "nothing contained in this section . . . shall be construed to vest an attorney in fact with, or authorize an attorney in fact to . . . make any decisions regarding medical treatments or health care, except as incidental to decisions regarding property and finances." *Id.* at § 34-6-108(c)(8).

8

A durable power of attorney for health care is different. This type of power of attorney "means a durable power of attorney to the extent that it authorizes an attorney in fact to make health care decisions for the principal." *Id.* at § 34-6-201(1). "Health care" includes "any care, treatment, service, or procedure to maintain, diagnose or treat an individual's physical or mental condition . . . ." *Id.* at § 34-6-201(2). And the statute defines a "health care decision" as "consent, refusal of consent or withdrawal of consent to health care." *Id.* at § 34-6-201(3).

What is more, "[a]n attorney in fact under a durable power of attorney for health care may not make health care decisions unless" the parties meet several statutory requirements. *Id.* at § 34-6-203. First, the durable power of attorney for health care must "specifically authorize[] the attorney in the fact to make health care decisions." *Id.* at § 34-6-203(a)(1). Second, the durable power of attorney for health care must contain the date of execution. *Id.* at § 34-6-203(a)(2). And finally, the document "must be in writing and signed by the principal." *Id.* at § 34-6-203(a)(3).

Here the parties do not dispute that Ms. Crawford designated Plaintiff as her general power of attorney. (*See* ECF Nos. 19-1 at PageID 222; 27 at PageID 260.) But they do argue over whether the POA gave Plaintiff the authority to enter the Agreement. And if Plaintiff lacked this authority, then the parties never formed an enforceable arbitration agreement.

With that in mind, who has the burden of proof here?

**B.   Burden of Proof**

"[T]he burden of proving the existence of a valid contract is upon the person relying on the contract." *Randolph v. Randolph*, 937 S.W.2d 815, 821 (Tenn. 1996); *Next Generation, Inc. v. Wal-Mart, Inc.*, 49 S.W.3d 860, 864 (Tenn. Ct. App. 2000) (finding that the party relying on the contract has to prove its existence by a preponderance of the evidence). The movant in a

motion to compel arbitration "bears the ultimate burden of establishing the existence of a valid agreement to arbitrate." *Hammond*, 2020 WL 2473717, at *3. And "[a]s the proponent of the arbitration agreement, [the defendants] have the burden of establishing that [the plaintiff] had authority to sign the agreement on the Decedent's behalf." *Barbee v. Kindred Healthcare Operating, Inc.*, No. W.2007-00517-COA-R3-CV, 2008 WL 4615858, at *12 (Tenn. Ct. App. Oct. 20, 2008) (finding that defendants failed to carry their burden of proving the plaintiff had authority to execute an arbitration agreement on the principal's behalf). So the burden here lies with Allenbrooke.

## ANALYSIS

Allenbrooke's motion to compel arbitration centers on two questions. First, was entering the Agreement a health care decision? And if so, did Plaintiff have the authority to make a health care decision for Ms. Crawford?

Plaintiff argues that signing the Agreement was a health care decision. And that, although Plaintiff was Mrs. Crawford's attorney-in-fact, the POA's language did not grant him authority to make health care decisions for her. (ECF No. 27 at PageID 255.) Defendant, on the other hand, argues that the decision to enter the Agreement was a legal one that Plaintiff had full authority to make on behalf of his mother. (ECF No. 19-1 at PageID 224.)

**I.     Entering the Arbitration Agreement Was a Health Care Decision**

  **A.     Entering the Agreement Was a Health Care Decision Under the Agreement's Plain Language**

For starters, the Agreement says to anyone signing it that "the signing of this Agreement, both by itself and in conjunction with the corresponding admission and receipt of services, *is a health care decision*." (ECF No. 19-2 at PageID 234.)(emphasis added.) "In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain

the parties' intent." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006).  And as others courts considering the same arbitration agreement have found already, "[t]he plain terms of the Agreement here clearly show that the parties intended the execution of the Agreement to constitute a healthcare decision." *Jones v. Allenbrooke Nursing & Rehab. Ctr., LLC*, No. W2019-00448-COA-R3-Cv, 2019 WL 6842372, at *4 (Tenn. Ct. App. Dec. 16, 2019); *Sykes v. Quince Nursing & Rehab. Ctr., LLC*, No. 2:19-cv-02602-SHL-tmp, 2020 WL 7866881, at *3 (W.D. Tenn. Sept. 1, 2020).

Allenbrooke, however, argues that the Agreement's plain language says something else. It argues that "the plain language of the Arbitration Agreement provides that signing the Agreement is a health care decision *only if* there is no Power of Attorney or Guardian/Conservator."  (ECF No. 19-1 at PageID 229 (emphasis added).)

The Agreement says,

> **Those Signing this Contract.**  A person signing who routinely makes decisions for the Resident, if not the Power of Attorney or Guardian/Conservator, will be considered a health care surrogate/proxy and/or Legal Representative.  The parties agree that the signing of this Agreement, both by itself and in conjunction with the corresponding admission and receipt of services, is a health care decision.  This executed Agreement becomes a part of the Resident's underlying Admission Agreement(s).  The term "Resident" shall refer collectively to those signing with or for the Resident . . . .

(ECF No. 19-2 at PageID 234.)  Allenbrooke contends that the sentence "declaring that the signing of the Agreement is a 'health care decision' is intended only to address situations where the person is a Health Care Surrogate . . . Such language is not intended to address situations where the signatory is authorized to sign the Agreement by a Power of Attorney or appointment as a Guardian/Conservator."  (ECF No. 19-1 at PageID 230.)

But Allenbrooke's suggested interpretation of the Agreement is not persuasive.  For one thing, the title of this section of the Agreement is "Those Signing this Contract."  (ECF No. 19-2

11

at PageID 234.)  The section's title thus directs that the section applies to anyone signing the Agreement.  What is more, the language in the Agreement is clear—"[t]he parties agree that the signing of this Agreement, both by itself and in conjunction with the corresponding admission and receipt of services, is a health care decision."  (*Id.*); *see also Jones*, 2019 WL 6842372, at *4.  Nothing limits this sentence to health care surrogates only.  And looking at the rest of that section, it sets "Power of Attorney or Guardian/Conservator," with commas.  But if that is an effort to say that the decision for them is not health care related, this Court cannot find that meaning from its words.  Indeed, the section later defines the term "Resident," and to explain that the Agreement becomes part of the Resident's underlying admissions agreement.  (ECF No. 19-2 at PageID 234.)  As a result, reading this section to apply only to health care surrogates is against the Agreement's plain language.

The district court in *Sykes* considered the same argument about the same arbitration agreement, and found that Allenbrooke's "reading makes little sense."  2020 WL 7866881, at *3.  To be sure, this Court agrees.  Allenbrooke does not explain why the Agreement is a health care decision only when a health care surrogate signs the agreement.  And if the Court were to adopt Allenbrooke's interpretation of the Agreement, the rest of the section "would apply to all signatories except attorneys in fact.  This interpretation goes against the likely intent of the drafter: to bind all parties, whether attorneys in fact or not, to the clause in its entirety."  *Id.*

So in short, viewing all facts and inferences in the light most favorable to Plaintiff, the Court finds that entering the Agreement was a health care decision under the Agreement's plain language.

### B. Entering the Agreement was a Health Care Decision Under Tennessee Law

Signing the Agreement was a health care decision under Tennessee law too. *See Owens v. Nat'l Health Corp.*, 263 S.W.3d 876, 884 (Tenn. 2007); *Jones*, 2019 WL 6842372, at *3 ("[T]he execution of admission documents at a health care facility is a healthcare decision."); *Bockelman v. GGNSC Gallatin Brandywood LLC*, No. M2014-02371-COA-R3-CV, 2015 WL 5564885, at *6 (Tenn. Ct. App. Sept. 18, 2015); *Barbee*, 2008 WL 4615858, at *11. Indeed, in *Owens* v. *National Health Corp.*, the Tennessee Supreme Court held that admitting someone to a nursing home "clearly constitutes a 'health care decision'" under § 34-6-201. 263 S.W.3d at 884.

In *Owens*, a principal executed a power of attorney for health care with two other people. *Id.* at 879. Later, the principal ended up in the nursing home maintained by the defendants. *Id.* at 880. And as part of her admissions contract, the attorneys-in-fact agreed to an arbitration provision. *Id.* The Tennessee Supreme Court then considered whether the power of attorney for health care authorized the principal's attorneys-in-fact to enter the arbitration agreement for the principal. The plaintiff argued that the decision to sign the arbitration agreement was a legal one, not a health care decision, and so the power of attorney for health care did not authorize the attorneys-in-fact to sign the arbitration agreement. *Id.* at 884.

The *Owens* court, however, found that the attorneys-in-fact did have authority to make certain legal decisions under the health care power of attorney. To come to this conclusion, the court analyzed the language of the power of attorney and the Durable Power of Attorney for Health Care statute, § 34–6–201. *Id.* The court found that under the statutory definitions of "health care" and "health care decision," "the decision to admit the third party to the nursing home clearly constitutes a 'health care decision.'" *Id.*

13

That court also explained that "an attorney-in-fact acting pursuant to a durable power of attorney for health care may sign a nursing-home contract that contains an arbitration provision because this action is necessary to 'consent . . . to health care.'" *Id.* (quoting Tenn. Code Ann. § 34–6–201(3)). As a result, the court found that the power of attorney for health care gave the attorneys-in-fact the authority to enter the arbitration agreement. *Id.*; *see also Mitchell v. Kindred Healthcare Operating, Inc.*, 349 S.W.3d 492, 498 (Tenn. Ct. App. 2008); *Raines v. Nat'l Health Corp.*, No. M2006-1280-COA-R3-CV, 2007 WL 4322063, at *7 (Tenn. Ct. App. Dec. 6, 2007) ("A power of attorney covering health care decisions does authorize the attorney-in-fact to enter into an arbitration agreement on behalf of the principal as part of a contract admitting the principal to a nursing home").

Put another way, the issue in *Owens* was whether an attorney-in-fact with a power of attorney for health care could make a legal decision (entering a contract for health services that included an arbitration agreement) for the principal. 236 S.W.3d at 884; *see also Wilkins v. GGNSC Springfield, LLC*, No. M2013-01536-COA-R3-CV, 2014 WL 819460, at *3 (Tenn. Ct. App. Feb. 27, 2014) (explaining that the question in *Owens* was "whether the health care power of attorney at issue in that case was sufficiently broad to give the attorney-in-fact authority to sign an admission agreement which contained a binding arbitration clause."). And the court found that, to exercise the power of attorney for health care and "consent to health care" for the principal, the attorney-in-fact may need to enter a contract and thus make "legal" decisions for the principal too. *Owens*, 236 S.W.3d at 884.

Here Allenbrooke argues that considering the Agreement to be a health care decision "runs counter to the Tennessee Supreme Court's decision in *Owens*." (ECF No. 19-1 at PageID 227.) This is because Allenbrooke interprets *Owens* as "definitively decid[ing]" that signing an

14

arbitration agreement "could be considered a health care or legal decision." (*Id.* at PageID 228; *see also* ECF No. 33 at PageID 494.) But this is not what the court in *Owens* found. In fact, the Tennessee Supreme Court held that admitting someone to a nursing home—and signing an accompanying arbitration agreement—"clearly constitutes a 'health care decision'" under § 34-6-201. *Owens*, 263 S.W.3d at 884.

Defendant also argues that, after *Owens*, the distinction between health care and legal decisions "should not determine the extent of an agent's authority[.]" (ECF No. 33 at PageID 494.) But contrary to Allenbrooke's contentions, the court in *Owens* did not find that the distinction between legal and health care decisions was irrelevant when determining an attorney-in-fact's authority. True enough, the *Owens* court did explain that the "distinction between making a legal decision and health care decision fails to appreciate that signing a contract for health care services, even one without an arbitration provision, is itself a 'legal decision.'" 263 S.W.3d at 884. With that in mind, the court noted that "[h]olding that an attorney-in-fact can make some 'legal decisions' but not others would introduce an element of uncertainty into health care contracts signed by attorneys-in-fact that would likely have negative effects on their principles." *Id.* at 885.

That said, "the distinction between a legal decision and a healthcare decision is still a relevant one for authorization under Tennessee law." *See Sykes*, 2020 WL 7866881, at *3. Indeed, the Tennessee Uniform Durable Power of Attorney Act and Durable Power of Attorney for Health Care statute distinguish between a general power of attorney which allows an agent to make legal decisions, and a power of attorney for health care that allows an agent to make health care decisions. And in *Owens*, the court only considered whether someone with a power of attorney for health care could make legal decisions—not whether an attorney-in-fact with a

15

general power of attorney could make health care decisions. *Owens*, 263 S.W.3d at 885. As a result, the Tennessee Supreme Court has not found that the difference between legal and health care decisions is irrelevant when deciding whether a general power of attorney authorizes one to make a health care decision for the principal. Nor did the court in *Owens* alter the statutory distinction between a power of attorney and a power of attorney for health care.

In sum, *Owens* explains that some health care decisions will also involve legal decisions. This means that an attorney-in-fact with a power of attorney for health care may make some legal decisions too. *Owens*, 263 S.W.3d at 885. But the converse does not appear to be true. Put differently, to make a legal decision, an attorney-in-fact need not make any health care decisions. *Sykes*, 2020 WL 7866881, at *3 ("[W]hile some legal decisions, like hospital admission, are necessary to fully manage the healthcare of a principal, no healthcare decisions are necessary to fully manage the legal and financial affairs of the principal.")

And so, with all this in mind, the court finds that the distinction between legal and health care decisions is still relevant under *Owens*. What is more, entering the Agreement was a health care decision under Tennessee law. *See Owens*, 263 S.W.3d at 884; *Jones*, 2019 WL 6842372, at *3; *Bockelman*, 2015 WL 5564885, at *6; *Barbee*, 2008 WL 4615858, at *11.

## II. Plaintiff Lacked Authority to Make a Health Care Decision for Ms. Crawford

The next question is whether the POA gave Plaintiff the authority to make health care decisions for Ms. Crawford. It did not.

"A power of attorney is a written instrument that creates a principal-agent relationship. The instrument itself indicates the purpose of the agency and the extent of the agent's powers." *Mitchell*, 349 S.W.3d at 496. "[P]owers of attorney should be interpreted according to their plain terms." *Tenn. Farmers Life Reassurance Co. v. Rose*, 239 S.W.3d 743, 750 (Tenn. 2007). And

16

so, whether someone has the authority to sign an agreement as an attorney-in-fact depends on the specific language of the power of attorney executed by the parties.

To have a durable power of attorney for health care, the power of attorney document must "specifically authorize[] the attorney in the fact to make health care decisions." Tenn. Code Ann. § 34-6-203(a)(1). It follows that, if the document does not specifically authorize the attorney-in-fact to make health care decisions, then the attorney-in-fact lacks the authority to make a health care decision for the principal. *Id.*; *see also Sykes*, 2020 WL 7866881, at *2 ("[U]nder Tennessee law, an attorney in fact may not make healthcare decisions unless the agreement '*specifically authorizes* the attorney in fact to make health care decisions.'" (citing Tenn. Code Ann. §34-6-203)).

That said, the POA that Ms. Crawford signed is broad. It authorizes Plaintiff to enter into "contracts and instruments of every kind . . . to the same extent . . . as [Ms. Crawford] could." (ECF No. 19-3 at PageID 238.) What is more, the POA "shall be construed for all purposes as vesting said Marvius Ray Crawford with an unlimited, open, general power of attorney of the broadest fashion possible to bind [Ms. Crawford] in all matters whatsoever." (*Id.*)

Yet § 34-6-203 is clear that, for an attorney-in-fact to have authority to make a health care decision for a principal, the power of attorney document must "specifically authorize" the attorney-in-fact to make health care decisions. And here, the POA fails to mention health care. As a result, the POA does not "specifically authorize" Plaintiff to make health care decisions for his mother.[3]  *See Sykes*, 2020 WL 7866881, at *3 ("[S]tate law allows healthcare attorneys in

---

[3] For instance, the POA does "specifically authorize [Ms. Crawford's] attorney-in-fact . . . to act for [her] in the organization of any corporation . . . ." (ECF No. 19-3 at PageID 238.) This just goes to show that the POA could have, but did not, specifically authorize Plaintiff to make health care decisions.

17

fact to make all decisions necessary to healthcare, but it explicitly limits the ability of attorneys to make healthcare decisions unless 'specifically authorize[d].'" (quoting Tenn. Code Ann. § 34-6-201(3); § 34-6-203)).

Plus as Plaintiff points out, the POA refers to the "Uniform Durable Power of Attorney Act," which provides in part that "[n]othing contained in this section . . . shall be construed to vest an attorney in fact with, or authorize an attorney in fact to . . . [m]ake any decisions regarding medical treatment or health care, except as incidental to decisions regarding property or finances." Tenn. Code Ann. § 34-6-108(c)(9). This shows that a general power of attorney under the Uniform Durable Power of Attorney Act does not give an attorney-in-fact authority to make health care decisions. Instead, to have authority to make health care decisions, Ms. Crawford needed to make Plaintiff her power of attorney for health care under § 34-6-201. And because she did not "specifically" give Plaintiff this authority, he could not enter the Agreement on her behalf.

With all this in mind, the Court thus **DENIES** Allenbrooke's motion to compel arbitration.

## CONCLUSION

In the end, entering the Agreement was a health care decision. And the POA did not give Plaintiff the authority to make health care decisions for Ms. Crawford. As a result, there is no valid contract requiring arbitration of Plaintiff's claims. The Court thus **DENIES** Allenbrooke's motion to compel arbitration and its request to stay the case.

**SO ORDERED**, this 1st day of September, 2021.

        s/Thomas L. Parker
        THOMAS L. PARKER
        UNITED STATES DISTRICT JUDGE